UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) DOCKET NO.: 3:19-cr-00099-RJC-DCK |
| v. | ) |
| ERIC DEWAYNE LEAK | ) |

**SUPPLEMENTAL MEMORANDUM**

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and hereby files this Supplemental Memorandum to more fully answer the four questions posed by the Court at the hearing on September 25, 2019. Specifically, the Court raised the following questions:

1. Is venue of this matter proper in the Western District?

2. Is promotional money laundering properly charged when the specified unlawful activity promoted was not part of the underling crime that generated the criminal proceeds that were laundered?

3. Did the defendant conspire with at least one other person to commit promotional money laundering as charged in the Bill of Information?

4. Does making illegal payments to collegiate athletes constitute specified unlawful activity?

As set forth below, the answer to each of these questions is Yes. The Plea Agreement, which was "a bargain in which the defendant properly obtain[ed] some consideration for his agreement to plead guilty," accords with the facts and the law and should be accepted. *United States v. DeFusco*, 949 F.2d 114, 119 (4th Cir. 1991); *Cf. United States v. Wilson*, 81 F.3d 1300, 1307-08 (4th Cir. 1996) ("One who has pled guilty and done so voluntarily, understandingly, and with knowledge of the consequences of his plea ... has evinced a desire to waive technicalities, to come to terms with the legal system, and to admit his fault.") (internal quotations omitted).

**INTRODUCTION**

The investigation of the defendant ERIC LEAK that gave rise to this matter began in or around May 2014, after North Carolina state law enforcement officers received a complaint regarding LEAK and he and his wife's sports management business Hot Shots Sports Management (Hot Shots). A separate investigation of LEAK related to his behavioral health company Nature's Reflections, a Medicaid enrolled provider, was already underway in the Middle District of North Carolina. That investigation focused on Medicaid claims submitted by Nature's Reflections from September 2011 through February 2014, and it was frequently the subject of news articles in the Raleigh area, as LEAK was a former North Carolina State football player. For example, in February 2014, Raleigh news outlets reported that:

> "Eric Leak - a former North Carolina State University football player and disassociated booster - and his wife have profited from two mental health counseling companies, and state investigators now believe one of those companies was stealing taxpayer dollars. The company is Nature's Reflections, which is based in the Triangle. It provides behavioral counseling and bills the state for Medicaid reimbursement. The state believes some of the billing was fraudulent."

In March 2015, a federal seizure warrant affidavit was filed publicly and was the subject of numerous news articles. The affidavit disclosed the federal criminal investigation into Nature's Reflections, LEAK, and LEAK's wife and alleged that there was probable cause that they committed various criminal offenses, including fraudulently billing Medicaid for millions of dollars in false claims. The affidavit was submitted in support of seizure warrants for vehicles allegedly obtained from the proceeds of LEAK's Medicaid fraud. One of the vehicles had been purchased for LEAK's in-laws – KMC and PLC, and it was subsequently seized from them by federal law enforcement officers. The affidavit also detailed how LEAK and his wife transferred

2

at least $205,000 in Medicaid proceeds from Nature's Reflections to fund Hot Shots. Similarly, in November 2015, a forfeiture complaint and supporting affidavit were filed publicly containing similar allegations. It, too, was the subject of numerous news articles.

In March 2016, state law enforcement officers looking into LEAK's sports management business obtained search warrants of two properties located in Raleigh, North Carolina owned by LEAK and his wife. One of those properties was his primary residence and the other was a townhouse from which LEAK, among other things, operated Hot Shots. Law enforcement officers seized various records relating to LEAK's operation of Hot Shots, including Western Union records and federal tax filings. The seized materials established that LEAK's father-in-law, PLC, a resident of Waxhaw, North Carolina, provided bookkeeping and tax services for Hot Shots and some of its professional athlete clients. PLC also had provided bookkeeping and tax services for LEAK and Nature's Reflections. After reviewing the materials obtained during the search warrant, and having the Middle District of North Carolina decline to expand its ongoing Medicaid fraud investigation, state law enforcement officers approached the FBI and the United States Attorney's Office for the Western District of North Carolina.

After the Western District became involved in this investigation, numerous interviews were conducted and a voluminous amount of documents was obtained. The interviews included, among others, PLC, LEAK, and two of LEAK's business associates: JTJ, a convicted felon, and BWJ, a friend of LEAK's brother-in-law. The documents included, among other things, transaction records from Western Union showing wire transfers made by LEAK, PLC, JTJ, BWJ and others from, to, and/or through the Western District of North Carolina during the period from May 2012

3

through the end of 2014. At least some of these wire transfers constituted impermissible payments to student athletes and/or family members of student athletes.

In or around February 2018, the undersigned and counsel for LEAK began discussions about the possibility of resolving the matter with a pre-indictment plea, and the United States provided limited pre-indictment discovery to LEAK. LEAK was preparing to enter a guilty plea in the Middle District of North Carolina at the time concerning his operation of Nature's Reflections. He pleaded guilty in the Middle District on or about March 1, 2018.

The discussions between counsel for LEAK and the undersigned continued throughout 2018. As part of those discussions, LEAK debriefed with law enforcement pursuant to a proffer agreement regarding this matter. The parties attempted to reach an agreement before LEAK was sentenced in the Middle District, which was initially supposed to occur on or about August 2, 2018. The parties were not able to reach an agreement prior to LEAK's sentencing in the Middle District, which was eventually held on September 28, 2018. LEAK was ordered to report to the Bureau of Prisons to begin serving his eighteen-month sentence on January 17, 2019.

After LEAK reported to the Bureau of Prisons, he entered into the Plea Agreement in this case in March 2019. It was understood that part of LEAK's motivation for pleading guilty in this matter was his desire to end the investigation into himself, his businesses, and his business associates, including family and friends. In April 2019, LEAK was transferred to the Western District for his initial appearance, Rule 11 hearing, and related proceedings.

## DISCUSSION

"By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime." *United States v. Broce*,

4

488 U.S. 563, 570 (1989). On April 11, 2019, LEAK swore under penalty of perjury that he was guilty of conspiring to commit promotional money laundering in violation of 18 U.S.C. § 1956(h) for his role in making illegal payments to collegiate athletes and their families to induce those athletes to enter into business relationships with him or his associates. LEAK and his counsel stated on the record that LEAK understood the charge against him and any potential defenses he may have and he was voluntarily pleading guilty to it.

The Court has asked for more information on four topics so that it can exercise its independent responsibility to determine "that the conduct which the defendant admits constitutes the offense charged in the … information." *McCarthy v. United States*, 394 U.S. 459, 471 (1969) (quoting Fed. R. Crim. P. 11, Notes of Advisory Committee on Criminal Rules). As set forth below, LEAK and his coconspirators' conduct constitutes a violation of 18 U.S.C. § 1956(h), and thus the Court should accept his guilty plea. *See DeFusco*, 949 F.2d at 120 ("trial court has wide discretion when determining whether a factual basis exists").

### I. Venue is proper in the Western District.

LEAK engaged in a conspiracy to commit promotional money laundering. Part of that conspiracy included sending interstate wires via Western Union to student-athletes. (Doc. 3, Factual Basis, ¶ 6). Some of those wires traveled to, from, and/or through the Western District. Such conduct is sufficient to establish venue in the Western District. *See United States v. Day*, 700 F.3d 713, 725 (4th Cir. 2012) ("To establish venue [over the charged money laundering offense], the government must adduce sufficient evidence for a reasonable jury to conclude that the defendant committed an overt act in furtherance of the charged conspiracy inside the

5

appropriate judicial district."). Section 1956(i) of Title 18 contains the venue provision for money laundering offenses. It provides in relevant part that:

> (1) [A] prosecution for an offense under [Section 1956] may be brought in— (A) any district in which the financial or monetary transaction is conducted…
>
> (2) A prosecution for an attempt or conspiracy offense under [Section 1956] may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.
>
> (3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2))[1] any portion of the transaction may be charged in any district in which the transaction takes place.

The transmission of wire transfers to, from and/or through this District is sufficient to establish proper venue over the charged conspiracy. *See United States v. Sanchez*, No. 3:16-cr-00136-MOC-DSC, 2018 WL 4760844 (W.D.N.C. Oct. 2, 2018) (venue over money laundering conspiracy appropriate because coconspirators had victims initiate Western Union wire transfers that were routed and processed in Western District).

**II. Promotional money laundering includes the promotion of new specified unlawful activity.**

LEAK has admitted conspiring with others to use the proceeds of specified unlawful activity, *to wit* paying kickbacks under a federal health program in violation of 42 U.S.C. §1320a-7b(b)(2)(A), to promote a new specified unlawful activity. (Doc. 3, ¶¶ 4-7). This conduct constitutes a violation of 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits one from conducting a

---

[1] Section 1956(c)(2) defines "conducts" to include "initiating, concluding, or participating in initiating, or concluding a transaction."

6

financial transaction involving "the proceeds of specified unlawful activity … with the intent to promote the carrying on of specified unlawful activity." The undersigned has conducted significant research, including consulting with the Money Laundering and Asset Recovery Section of Main Justice, and was unable to locate any cases finding that a violation of this provision was limited to instances where a defendant had promoted *ongoing* or past specified unlawful activity. Indeed, the Justice Department's Criminal Resource Manual specifically contemplates that federal prosecutors will charge promotional money laundering involving "Transactions where the 'promotion' element involves an SUA different from the SUA that generated the proceeds." *See* DOJ Criminal Resource Manual, Section 2187.[2] While the research did not locate any reported cases explicitly addressing the question raised by the Court, it did locate the following cases in which it the promoted specified unlawful activity appears to have been new, as opposed to ongoing or past, criminal conduct:

- *United States v. Dhafir*, 577 F.3d 411, 413 (2d Cir. 2009) (defendant convicted of promotional money laundering for using proceeds of health care and tax fraud to promote violations of the International Economic Powers Act);

- *United States v. Akintobi*, 159 F.3d 401, 404 (9th Cir. 1998) (affirming convictions of defendants for using proceeds of mail theft, mail fraud and bank fraud to promote new credit card fraud);

- *United States v. Fata*, 650 F. App'x. 260 (6th. Cir. 2016) (affirming promotional money laundering conviction of defendant who deposited proceeds from fraudulent medical insurance and Medicare claims related to an oncology center to start a new PET scan facility, which would be used to facilitate new fraudulent billing);

- *Santana v. United States*, No. C08–1493, 2009WL1228556 (W.D.Wa. May 4, 2009) (rejecting collateral attack of defendant convicted of promotional money

---

[2] Available at: https://www.justice.gov/jm/criminal-resource-manual-2187-new-approval-and-reporting-requirements-certain-money-laundering.

laundering for using "profits of his methamphetamine business in order to fund a new marijuana business").

- *United States v. Catapano*, No. 05cr229, 2008WL4534010 (E.D.N.Y. Oct. 6, 2008) (denying motion to dismiss indictment where "case involves proceeds that the government indicates it intends to show constituted profits used to commit new and discrete crimes….[as opposed to] subsequent illegal transactions in an effort merely to pay the expenses of one, ongoing illegal enterprise.")

These cases are consistent with a plain reading of the statute, which proscribes the "carrying on of specified unlawful activity." Had Congress intended to limit promotional money laundering to instances where a defendant promoted the original specified unlawful activity, it could have simply inserted the word "the" before specified unlawful activity, i.e., it could have proscribed conducting a financial transaction "with the intent to promote the carrying on of *the* specified unlawful activity.[3]" That Congress did not so limit the statute makes sense, for the public policy concerns that led Congress to prohibit the promotion of the original specified unlawful activity are just as strong with respect to the promotion of new specified unlawful activity. *Cf. United States v. Santos*, 533 U.S. 507, 515 (2008) ("A rational Congress could surely have decided that the risk of leveraging one criminal activity into the next poses a greater threat to society than the mere payment of crime-related expenses and justifies the money-laundering statute's harsh penalties.").

For all these reasons, the Court should find that 18 U.S.C. § 1956(a)(1)(A)(i) is violated when, like here, the defendant uses the proceeds of specified unlawful activity to promote new specified unlawful activity.

---

[3] Alternatively, Congress could have used the phrase "continue to carry on" rather than the phrase "carrying on." *See* Webster's New World Dictionary, 2d College Ed, 1980 (defining "carry on," in relevant part, as (1) "to engage in; conduct; (2) to go on (with); continue as before, esp. in the fact of difficulties.").

8

### III. LEAK CONSPIRED WITH AT LEAST ONE OTHER PERSON.

As part of the charged conspiracy, LEAK and others conducted and caused to be conducted illegal financial transactions with student athletes and their families. (Doc. 3, ¶¶ 4-7). LEAK has admitted knowing that the money used to make those payments constituted the proceeds of specified unlawful activity, specifically the payment of illegal healthcare kickbacks. (Doc. 3, ¶7). LEAK's coconspirators also knew, or were willfully blind to the fact, that the money used to make the payments was derived at least in part from "some form of unlawful activity." 18 U.S.C. § 1956(a)(1); *see also United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005) ("[T]he question is not whether [defendant] knew the actual source of the funds, merely whether he knew they were proceeds of some illegal activity. Knowledge may be actual or constructive—by a showing of conscious avoidance of actual knowledge.") (internal citations omitted); *United States v. Gordon*, 754 F. App'x 171, 180 (4th Cir. 2018) (jury could infer defendant willfully avoided learning that funds came from illegal activity by failing to ask questions of person who supplied the funds, or to notice obvious red flags raised by the odd nature of the transactions).

As an initial matter, LEAK, with knowledge of the elements of the statutes and having been advised of any potential defenses, has admitted that he conspired with others to commit promotional money laundering. LEAK's admission alone is a sufficient basis upon which to find that his coconspirators had (or were willfully blind to) the requisite knowledge regarding the unlawful source of the money. *See United States v. Morrow*, 914 F.2d 608, 611 (4th Cir. 1990) ("Rule 11(f) 'requires an adequate factual basis for a guilty plea; it does not require the judge to

9

replicate the trial that the prosecutor and defendant entered a plea agreement to avoid.'") (quoting *United States v. Lumpkins*, 845 F.2d 1444, 1451 (7th Cir. 1988)).[4]

In any event, as set forth below, there is ample additional evidence that at least one of LEAK's business associates and/or family members knew, or was willfully blind to the fact, that at least part of the money used to make the illegal payments to college athletes was derived from unlawful activity.

First, negative news articles began appearing about LEAK by no later than November 2011 (before the illegal payments to athletes started). Initially, news articles discussed LEAK providing improper benefits to a North Carolina State basketball player. By no later than February 2014 (well before the illegal payments to athletes had ceased), however, the news articles discussed allegations that LEAK and his company Nature's Reflections (which was out of business) had been "stealing taxpayer dollars" through millions of dollars in improper Medicaid claims. Then, in 2015 (also during the charged conspiracy), the federal seizure warrant affidavit and subsequent forfeiture complaint were publicized, both of which disclosed the federal criminal investigation into Nature's Reflections, LEAK, and LEAK's wife and alleged that there was probable cause that they committed various criminal offenses, including fraudulently billing Medicaid for millions of dollars in false claims. Further, the affidavit specifically outlined how LEAK and his wife transferred Medicaid funds from Nature's Reflections to fund Hot Shots. For example, the affidavit

---

[4] In *Morrow*, the Fourth Circuit affirmed the trial court's finding of a factual basis to support the defendant's plea of guilty for investing the proceeds of an illegal methamphetamine operation notwithstanding that the defendant maintained his innocence and claimed the factual basis failed to establish "that he invested the money *knowing* that it came from the illegal proceeds of drug manufacturing." 914. F.2d at 611 (only "slight evidence" required to find defendant was a member of the charged conspiracy).

stated, "On December 20, 2012, Emily Leak withdrew $50,000.00 from Nature's Reflections LLC account [] and deposited the full amount into Hot Shots Sports Management LLC account []." It is reasonable to conclude that any individual working with LEAK to make, or account for, illegal payments to student athletes had actual or constructive knowledge that LEAK used the illegal proceeds from Nature's Reflections to fund, at least in part, Hot Shots and the student athlete payments.

Second, at least one of LEAK's employees involved in the making of illegal payments to student athletes, BWJ, also had access to bank records for Hot Shots and certain of its clients. Those records reflect commingling of funds between and among certain accounts of Nature's Reflections, Hot Shots, and/or certain Hot Shots' clients. For example, on August 15, 2013, an electronic transfer in the amount of $8,638.87 was made from the account of a Hot Shots client to a Nature's Reflections account.[5] BWJ later prepared a summary of expenditures for that Hot Shots client that reflected the transfer with a notation indicating that the payment was made to Nature's Reflections.

Third, BWJ and other LEAK associates, including PLC, also had firsthand knowledge of several questionable financial practices of LEAK and Hot Shots. For example, BWJ was involved in obtaining numerous loans for clients of Hot Shots, some of which he knew certain clients later claimed not to have authorized. In at least one instance, in April 2013, BWJ and his girlfriend signed as witnesses to a Power of Attorney document giving LEAK authority over the bank

---

[5] LEAK's father-in-law, PLC, would have also had access to these bank records, as he provided book-keeping and tax services to Hot Shots, Nature's Reflections, and this particular Hot Shots client. Some of the reports generated by PLC had line items that appear to be related to the illegal payment of athletes.

11

accounts of a Hot Shots client, who later claimed he had not authorized the document and had terminated Hot Shots.[6] BWJ signed the document as a witness, even though he had not seen the client sign the document. In another instance in 2013, BWJ knew that a car loan had been obtained in the name of a Hot Shots client for the express purpose of repaying the original loan taken out to purchase the car. The car was supposed to serve as collateral for the loan, but the title was never provided to the bank. BWJ knew that the proceeds of that loan were not used to pay off the car as originally represented but were used for other purposes.

BWJ also knew that purported charitable foundations had been set up for several Hot Shot's clients and bank accounts had been set up for those foundations. BWJ further knew that regular personal expenses of the athletes were paid out of the foundation accounts and that at least one such charitable foundation provided "scholarships" to the athlete's friend and a family member. BWJ also knew that at least one bank had closed a foundation account. BWJ also knew that LEAK withdrew cash out of various accounts of certain Hot Shots clients, and that LEAK used some of that cash to make payments to friends of LEAK.[7]

Further circumstantial evidence of BWJ's knowledge of the illegal source of Hot Shots' funds can be found in BWJ's fraudulent submissions to the North Carolina Secretary of State. At LEAK's request, BWJ submitted an application with the North Carolina Secretary of State to

---

[6] PLC also notarized various bank documents purportedly signed by certain Hot Shots clients, some of which the clients later claimed not to remember signing.

[7] Another LEAK associate, JTJ, who was also involved in the illegal payments to athletes, was also aware of several questionable financial transactions involving loans obtained by Hot Shots clients and the charitable foundations. JTJ pleaded guilty to conspiracy to commit bank fraud and wire fraud in the Southern District of Florida in October 2017. The charges stemmed from a scheme JTJ executed from July 2011 through July 2012 to obtain unauthorized loans in the names of professional athletes using forged documents, which was unrelated to LEAK.

12

register as an athlete agent in March 2013. He subsequently submitted renewal applications in March 2014 and March 2015. BWJ failed to disclose his association with Hot Shots on any of those applications despite the application specifically asking for employment information. LEAK would not have been able to register as an athlete agent with the state of North Carolina during this period, and BWJ's association with LEAK and Hot Shots would have raised significant red flags.

In short, the Court has more than enough information to find a sufficient factual basis to support the finding that LEAK's conspired with at least one other person who knew, or was willfully blind to the fact, that the source of the illegal payments to athletes was, at least in part, "from some form of unlawful conduct," which is all the statute requires. 18 U.S.C. § 1956(a)(1); *see also United States v. Flores*, 454 F.3d 149, 154-56 (affirming money laundering conviction of attorney who failed to "ask the natural follow-up questions" of client whose banking activities raised suspicions of third parties) (quoting *United States v. Wert-Ruiz*, 228 F.3d 250, 257 (3rd Cir. 2000).[8]

### IV. Making illegal payments to student athletes constitutes specified unlawful activity.

LEAK and his coconspirators' actions promoted at least two specified unlawful activities: bribery and wire fraud. Title 18 U.S.C. 1956(c)(7)(A) defines specified unlawful activity to include, among other things, "any act or activity constituting an offense listed" in 18 U.S.C. §

---

[8] *Cf. Wilson*, 81 F.3d at 1309 ("The question that really matters, however, … is whether appellant believed, at the time of the taking of his plea, that there was a substantial risk that a jury could find that he possessed the requisite intent. A defendant, in pleading guilty, does not have to believe that he committed all of the acts and possessed the statutorily-prescribed intent for the crime charged. The purpose of the plea hearing is to guarantee that the defendant understands the nature of the charges against him so that he can knowingly and voluntarily agree to plead guilty, rather than face the risk of a reasonable jury finding that he possessed the necessary 'mens rea' and committed the 'actus reus.").

13

1961(1). Section 1961(1), in turn, includes, among other things, "(A) any act or threat involving … bribery, … which is chargeable under State law and punishable by imprisonment for more than one year" and "Section 1343 (relating to wire fraud)." Neither Section 1956 nor 1961(1) provides any further definition of bribery chargeable under State Law.

**Bribery**

Webster's New World Dictionary, 2d College Ed, 1980, defines bribery as "the giving, offering, or taking of a bribe" and defines bribe, in part, as "anything, especially money, given or promised to induce a person to do something illegal or wrong." The Model Penal Code defines bribery to include soliciting, accepting, or agreeing "to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity…." *ULA Penal Code* § 224.8(1). These definitions are consistent with the Supreme Court's broad interpretation of bribery in the context of the Travel Act (18 U.S.C. § 1952) – a sister statute to 18 U.S.C. § 1956 – that also prohibits certain conduct constituting bribery under state law.[9] *See Perrin v. United States,* 444 U.S. 37 (1979). In *Perrin*, the Court rejected defendant's argument that the Travel Act's prohibitions were limited to bribery committed by public officials. 444 U.S. at 41-43. The Court reasoned that at the time the Travel Act was passed in 1961 (several years *before* Section 1956 and 1961 were passed) "federal and state statutes had extended the term bribery well beyond its common-law meaning" to include the bribery of agents or employees of common carriers and television game show

---

[9] The Travel Act prohibits, among other things, the use of interstate commerce to distribute the proceeds of "any unlawful activity" and defines "unlawful activity" to include "bribery … in violation of the law of the State in which committed or of the United States." 18 U.S.C. § 1952(a)(1) & (b).

14

contestants, among others. *Id.* at 43 (citing 49 U.S.C. § 1(17)(b) and 47 U.S.C. § 509[10]). The Court also found relevant that Congress had passed several other "federal statutes which make illegal the giving or receiving of payments to influence private duties but without using the word bribery." *Id.* at 43 n.8. Thus, making it clear that an anti-bribery statute need not use the word bribe. Finally, the Court noted that by 1961, 42 states had passed statutes that prohibited bribery of individuals acting in a private capacity, including several relating specifically to professional and amateur athletes. *Id.* at 45 & n.10 (citing Model Penal Code); *see also* 18 U.S.C. § 224 (making it a crime to "influence, in any way, by bribery any sporting contest….without regard to the amateur or professional status of the contestants therein"). Indeed, the Court in *Perrin* highlighted that in passing the Travel Act, one Senator "indicated his belief that the sports bribery scandals could be dealt with under the Travel Act." *Id.* at 46.

LEAK and his coconspirators' payments to student athletes to violate their duties to their respective colleges constituted bribery as described above. Some of those payments were made to athletes in North Carolina. North Carolina has a statute that makes it a felony, punishable by imprisonment for more than one year, to "furnish anything of value to a student-athlete" or to "furnish anything of value to any individual other than the student-athlete or another registered athlete agent." N.C.G.S. §§ 78C-98 & 78C-99. This statue was modeled after the Uniform Agent Athlete Act, which has been passed by dozens of states. The Uniform Act was created to address the "serious problems for student athletes and educational institutions" that arise by the

---

[10] Section 509 prohibits, among other things, "to induce or cause any contestant in a purportedly bona fide contest of intellectual knowledge … to refrain in any manner from using or displaying his knowledge or skill in such contest" by "means of bribery."

15

unscrupulous acts of those who seek to profit off of aspiring professional athletes, such tactics including "secret payments or gifts to the athlete, undisclosed payments or gifts to friends and relatives who may be in a position to influence the athlete, unrealistic promises and considerable arm-twisting." Unif. Athlete Agents Act prefatory note, 7 Part IB U.L.A. 55 (2000). The problems caused by such conduct include: "Athletes [who] lose eligibility and may damage promising professional careers. Universities and colleges [which] are sanctioned, [which] can be very severe and may include loss of, or liability to return, substantial revenues for participation in post-season events." *Id.* Congress also recognized the federal interest in taking action against such wrongdoers when it passed the Sports Agent Responsibility and Trust Act, 15 U.S.C. §§ 7801 – 7807 (that includes a "Sense of Congress" section stating, "States should enact the Uniform Athlete Agents Act …, to protect student athletes and the integrity of amateur sports from unscrupulous sports agents.").

While the North Carolina Agent Athlete Act does not use the term bribery, its prohibitions on paying student athletes to violate their private duties to their respective colleges fit comfortably with the definition of bribery articulated by the Supreme Court in *Perrin*. *See* 444 U.S. at 43 (discussing bribery as including "payments to private persons to influence their actions") and at 46 ("Members, Committees, and draftsmen [in Congress] used 'bribery' to include payments to private individuals to influence their actions."). The Supreme Court recognized that a statute does not need to use the term "bribery" to prohibit conduct that constitutes bribery. *Id.* at 43 n.8. (providing "[e]xamples of federal statutes which make illegal the giving or receiving of payments

16

to influence private duties but without using the word bribery");[11] *see also United States v. Gatto*, 295 F. Supp. 3d 336 (S.D.N.Y. 2018) (frequently using "bribery" to describe the payment of money to student-athletes in violation of NCAA and college rules). If a Jeopardy contestant can be "bribed" then so, too, can a college athlete. *See id.* at 43. There is no doubt that college athletes have as much, and likely much greater, duties to their respective colleges than a game show contestant has to the game show. Indeed, the federal anti-sports bribery statute makes that clear. S*ee* 18 U.S.C. § 224 (outlawing bribery of a college athlete in connection with a sporting contest). LEAK and his coconspirators' payments to student athletes constituted "bribery" in violation of North Carolina state law that was punishable by more than one year imprisonment, and thus was a specified unlawful activity.

**Wire Fraud**

LEAK and his coconspirators' illegal payments to college athletes, via wire transfers, defrauded those athletes' respective colleges in at least two ways. First, it defrauded the colleges out of controlling the allocation of their assets, i.e. their athletic scholarships. (Doc. 3, ¶ 9). Second, it defrauded the colleges by exposing them to tangible economic harm, including monetary fines, restrictions on athlete recruitment and the distribution of athletic scholarships, and the potential ineligibility of the schools to participate in various NCAA programs and tournaments, and

---

[11] Similarly, that North Carolina has enacted other more, general anti-bribery statutes does not preclude the Agent Athlete Act, which was enacted much later for a very specific purpose, from being considered a bribery statute. For example, the Federal Code contains numerous instances of conduct that can violate both a general and a more specific false statement statute. *See, e.g.,* 18 U.S.C. § 1001 & 7 U.S.C. §13(a)(4).

intangible economic harm such as reputational harm. *Id.* This exact conduct was specifically found to constitute wire fraud in the Southern District of New York. *Gatto*, 295 F. Supp. 3d at 343-46.

In *Gatto*, the Court denied motions to dismiss filed by the defendants who paid bribes to amateur athletes because it found the conduct deprived the affected colleges of certain property rights even though the defendants had not taken any money from the colleges, but rather, defendants claimed, had sought to help the colleges. *Id.*[12] In denying the motions to dismiss, the *Gatto* Court thoroughly considered, and rejected, the Seventh Circuit's 25-year old decision in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993). The *Gatto* Court's primary reason for rejecting the applicability of *Walters* is that, unlike the Second Circuit (and the Fourth Circuit), the *Walters* Court was not asked to, nor did it, consider the "Right to Control" theory of wire fraud or the fact that the defendant exposed the colleges to the risk of loss. 295 F. Supp. 3d at 343-346 (citing among others, *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017)).

In *Walters*, the Court overturned the wire fraud conviction of the defendant, a sports agent who had bribed college athletes, because he did not obtain money directly from the affected colleges. *Walters*, 997 F.2d at 1224-27. Unlike here and in *Gatto*, the Government did not allege or prove that the defendant in *Walters* deprived the colleges of the right to control the allocation of their scholarships or exposed the colleges to the risk of loss through monetary fines and other penalties. This distinction was sufficient in the eyes of the *Gatto* Court to render *Walters* inapplicable to the facts before it.[13] 295 F. Supp. 3d at 346 ("The question is not whether

---

[12] Gatto and his coconspirators were eventually convicted in October 2018.

[13] The *Gatto* Court also distinguished *Walters* on a separate ground, equally applicable here, that the defendant in *Walters* was only appealing the substantive charge, not a conspiracy or aiding and abetting charge. To the extent the affected colleges provided scholarships to student-athletes whom accepted

18

defendants are alleged to have obtained money or property from the universities, but whether they are alleged to have conspired to deprive the universities of money or tangible or intangible property.").

The Right to Control theory of wire fraud has been approved by multiple Circuit Courts, including the Fourth Circuit and even the Seventh Circuit subsequent to *Walters*. *See United States v. Gray*, 405 F.3d 227, 234 (4th Cir. 2005) (citing with approval cases from the Second, Fifth, Sixth, Eighth, Tenth, and D.C. Circuits holding "that the mail fraud and wire fraud statutes cover fraudulent schemes to deprive victims of their rights to control the disposition of their own assets"), *cert. denied*, 546 U.S. 912 (2005); *see also Sorich v. United States*, 709 F.3d 670, 675-676 (7th Cir. 2013) ("The scheme to distribute City jobs deprived the City of its right to control how its money was spent"), *cert. denied*, 134 S. Ct. 952 (2014); *United States v. Gillion*, 704 F.3d 284, 295 (4th Cir. 2012).[14] In approving the Right to Control theory of wire fraud, the Fourth Circuit started with the premise that, "The Supreme Court has made clear that the federal fraud statutes should be 'interpreted broadly insofar as property rights are concerned.'" 405 F.3d at 234 (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)).[15] And that, "[t]he Government need not

---

bribes from LEAK and his coconspirators and lied to the colleges about it, they would qualify as coconspirators who did obtain money and property directly from the affected colleges. 295 F. Supp. 3d at 347 & n.59 (citing *Walters*, 997 F.2d at 1227 & *United States v. Males*, 459 F.3d 154, 159 (2d Cir. 2006)).

[14] Indeed, the Second Circuit reaffirmed the Right to Control theory last month. *See United States v. Johnson*, No. 18-1503-CR, 2019 WL 4308625, at *1 (2d Cir. Sept. 12, 2019) (affirming conviction of defendant who "denied [victim] the right to control its assets by depriving it of information necessary to allow it to make discretionary economic decisions").

[15] The Fourth Circuit also noted that in *McNally*, the Supreme Court suggested that "the defendant's mail fraud conviction might have been affirmed had the jury been 'charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent.'" *Id.* (quoting *McNally*, 483 U.S. at 360).

19

Case 3:19-cr-00099-RJC-DCK   Document 22   Filed 10/15/19   Page 19 of 20

prove that the victim suffered a monetary loss as a result of the alleged fraud; it is sufficient that the victim was deprived of some right over its property." *Id.* (citing *Carpenter v. United States*, 484 U.S. 19, 26-27 (1987)). The Fourth Circuit concluded that, "[a] property owner has an intangible right to control the disposition of its assets." *Id.* (internal citation omitted).

LEAK and his coconspirators' conduct fits squarely into the Right to Control theory of wire fraud endorsed by the Fourth Circuit, and several other circuits – a theory, which was not before the Seventh Circuit in *Walters* (and which the Seventh Circuit later approved in *Sorich*). Thus, the conduct constitutes specified unlawful activity.

## CONCLUSION

Accordingly, for the reasons set forth above, the Court should find that LEAK's plea accords with the facts and the law and accept it in order to afford him the "bargain … [he] properly obtain[ed] … for his agreement to plead guilty." *United States v. DeFusco*, 949 F.2d 114, 119 (4th Cir. 1991).

Respectfully submitted this 15th day of October, 2019.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

*/s/ Daniel Ryan*
Assistant United States Attorney
IL Bar Number: 6279737
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail:  daniel.ryan@usdoj.gov